IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| THE BELOVED CHURCH, an Illinois Not-for-Profit Corporation, and PASTOR STEPHEN CASSELL, an individual, <br><br> Plaintiffs, <br><br> **v.** <br><br> JAY ROBERT PRITZKER, Governor of the State of Illinois, DAVID SNYDERS, Sheriff of Stephenson County, Illinois, STEVE SCHAIBLE, Chief of Police of the Village of Lena, Illinois, and CRAIG BEINTEMA, Administrator of the Department of Public Health of Stephenson County, Illinois, in their official capacities, <br><br> Defendants. | No. 3:20-cv-50153 <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

# INTRODUCTION

Plaintiffs seek to be treated with equal dignity and worth to liquor stores, landscapers, and lawyers. Plaintiffs have seen their right to free exercise of religion declared "non-essential" and trampled for almost a month and a half—with no end in sight—while other residents whose activities are deemed "essential" move and act with relative freedom.

Defendants have accomplished this by threat of civil and criminal penalty, issued under invalid statutory authority, and authority that, even if it were valid, violates constitutional and statutory commands protecting religious expression and assembly.

Defendant Pritzker's orders devalue and denigrate religious expression. Plaintiffs are entitled to have a public place in civil society, consistent with the privileged place of religion in our constitutional order—and to at least enjoy equal treatment to money-making enterprises that are and have been allowed to operate during the coronavirus epidemic.

With Defendant Pritzker's current executive order set to expire today, Plaintiffs have announced and intend to reopen their congregation and hold services this Sunday, May 3. However, Defendant Pritzker has announced yet another month-long executive order to come, which in draft form continues to treat churches and religious ministries as second-class citizens of Illinois—"non-essential" to the State. To stave off arrest and prosecution for the exercise of their fundamental liberties, Plaintiffs repair to this Court for refuge.

# STATEMENT OF FACTS

Plaintiffs are an evangelical Christian pastor, Stephen Cassell, and the church he leads in Lena, Illinois—The Beloved Church ("the Church"). Complaint, ¶¶ 13-14.[1]

---

[1] Pastor Cassell has verified the factual matters pleaded in the Verified Complaint in this case. Factual citations, therefore, will be to the relevant paragraphs of the Verified Complaint.

As an evangelical Christian, scripturally inspired and scripturally obedient congregation, the members of the Church regard certain rites and practices to be mandatory. Complaint, ¶¶ 24-33. Principal among those mandatory religious rites and practices is in-person, communal worship at Sunday morning services at the the Church's Lena church building. *Id.* Pastor Cassell regards it as a personal, scripturally mandated obligation of his own to plan, participate and lead those services himself. *Id.* But Pastor Cassell and his congregation at the Church have been unable to perform those religious obligations throughout the month of April.

Pastor Cassell and the congregation of the Church last had Sunday morning services on March 29, 2020. Complaint, ¶¶ 47-50. Since then, Defendants have forbidden the congregation to assemble and pray at Sunday services—or any other communal religious activity in the Lena church, for that matter—and the plaintiffs have so far complied with that command. *Id.*

Defendants communicated that command by personally serving Pastor Cassell with a "Cease and Desist Notice" drafted by Defendant Beintema, the Public Health Administrator for Stephenson County, and delivered by a uniformed sheriff's deputy, an employee of Defendant Snyders, the Sheriff of Stephenson County. *Id.*

That "Cease and Desist Notice" commanded Plaintiffs to "adhere to" the terms of an Executive Order promulgated by defendant Pritzker on March 9, EO 2020-10.[2] Complaint, ¶¶ 47-49 & Exh. A. Among the decrees in EO 2020-10 is a ban of all "public and private gatherings of any number of people occurring outside a single household or living unit … [A]ny gathering of more than ten people is prohibited unless exempted by this Executive Order." Sec. 1, par. 3.

The exemptions from that broad prohibition are granted to what the Executive Order terms "Essential Businesses and Operations." *Id.*, sec. 1, pars. 1, 2, and 3. But, lest Pastor Cassell

---

[2] Plaintiffs cite EO 2020-10 throughout, as it provides the model operative language found in all of the executive orders.

and the congregation of the Beloved Church have any doubt, the "Cease and Desist Notice" explicitly warned that "Essential Businesses and Operations have not been defined to include *religious gatherings*." Complaint, ¶¶ 47-49 & Exh. C (emphasis supplied). And to impress on Pastor Cassell and his congregation the seriousness of the command, the "Cease and Desist Notice" also warned that failure to "adhere" could result in the involuntary physical closure of the Lena church building, which action "police officers, sheriffs, and all other officers in Illinois are authorized to enforce… In addition ... you may be subject to additional civil and criminal penalties." *Id.*

Plaintiffs consequently stopped any group activity in the Lena church building, including Sunday morning services, after Pastor Cassell was served. Complaint, ¶ 50.

EO 2020-10 was to expire under its own terms on April 7, 2020, consonant with the statutory grant of emergency powers to defendant Pritzker, which limits the effective term of any such emergency action to "a period not to exceed 30 days" from the proclamation of a state of emergency. 20 ILCS 3305/7. *See*, Proclamation, March 9, 2020 (found at https://www2.illinois.gov/sites/gov/Documents/CoronavirusDisasterProc-3-12-2020.pdf), attached hereto as Exhibit A. Plaintiffs, then, were set to resume their Sunday morning services on Easter Sunday, April 12, 2020.

But on April 1, defendant Pritzker issued a second proclamation, purporting to "continue" his emergency powers for another 30 days, through the end of April. *See,* Proclamation, April 1, 2020 (found at https://www2.illinois.gov/sites/gov/Documents/APPROVED - Coronavirus Disaster Proc WORD.pdf) ("This proclamation continues the Governor's authority to exercise all of the emergency powers"), attached hereto as Exhibit B. Thereafter, pursuant to those purportedly "continue[d]" powers, defendant Pritzker promulgated EO 2020-18, that, among

3

other things, continued the stay-at-home order of EO 2020-10, including its prohibitions on religious gatherings. EO (found at https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-18.aspx) ("**WHEREAS**, I find it necessary to continue and extend the Executive Orders issued to date in response to the outbreak of COVID-19, Executive Orders 2020-03, 2020-04, 2020-05, 2020-06, 2020-07, 2020-08, 2020-09, and 2020-10 …"), attached hereto as Exhibit C.

Plaintiffs, therefore, believe they are and remain subject to the "adhere to" command of the "Cease and Desist Notice," and also face threats of arrest by Defendant Pritzker and the Illinois State Police, and so have had no Sunday services in their church throughout April. Complaint, ¶¶ 8, 45-50.

Moreover, so-called essential businesses continue to operate open to the public without abatement. Menards and Walmart stores in Stephenson County routinely assemble many more than 10 customers in their facilities. *Id.*, ¶ 52. Neither store requires those customers to observe 6-foot social distancing as required by Pritzker's Executive Orders, and no action by the authorities has been taken against them. *Id.* There are no time limits on the time one can remain wandering the aisles at these mega-stores, either.

Large enterprises with many employees also continue, like Snak King, a local snack food manufacturer. *Id.*, ¶ 53. Numerous employees are in attendance at the Snak King plant, presumably working 8-hour or more shifts to meet the needs of consumers of snack food products. *Id.*

All "mental health and substance use providers" in Illinois remain open for in-person counseling and services, under the "Healthcare and Public Health Operations" section of EO 2020-10. *Id.*, ¶ 54. Yet, the valuable religious and spiritual counsel and prayer provided by Pastor

Cassell is shut down—he is barred from gathering with his congregants or even leaving his home to visit them under the Executive Order. *Id.*, ¶¶ 26, 32, 33.

And liquor stores and all manner of other businesses, which cannot be said to provide the vital bare necessities of life, are allowed to remain open to the public in Stephenson and surrounding counties. *Id.*, ¶ 55. All the while, the Church is shuttered and religious gatherings and ministry and travel are banned.

## ARGUMENT

I. **PLAINTIFFS SATISFY THE STANDARD FOR A TEMPORARY RESTRAINING ORDER.**

A TRO is designed to preserve the *status quo ante* and prevent irreparable harm so long as is necessary to hold a hearing. *Granny Goose Foods, Inc. v. Bd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974). The *status quo ante* refers to the last peaceable uncontested status existing between the parties before the dispute developed (*viz.*, in this case, before Pastor Cassell was served with the "Cease and Desist Notice" at the end of March). *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC,* 562 F.3d 1067, 1071 (10th Cir. 2009). That *status quo ante* thus involved the plaintiffs' weekly Sunday morning services, religious gatherings, and religious ministries, along with travel thereto.

Whether requesting a temporary restraining order or a preliminary injunction, a movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Joelner v. Village of Washington Park*, 378 F.3d 613, 619-620 (7th Cir. 2004); *Christian Legal Society v. Walker*, 453 F.3d 853, 858-859 (7th Cir. 2006); *First Baptist Church v. Kelly*, No. 20-1102-JWB (D. Kan., April 18, 2020) (opinion attached, at 5).

If a moving party makes a *prima facie* showing of those elements, then

the inquiry becomes a 'sliding scale' analysis where these factors are weighed against one another … The loss of First Amendment freedoms unquestionably constitutes irreparable injury … Concomitantly, there can be no irreparable harm to [a governmental actor] when it is prevented from enforcing an unconstitutional [law].

*Joelner*, 378 F.3d at 619-620 (internal citations omitted).

Plaintiffs satisfy all these requirements here.

**A.   Plaintiffs Will Likely Succeed on the Merits.**

To determine the likelihood of success on the merits, the Court looks to the standards provided by the substantive law. To satisfy the "likelihood of success" inquiry, a plaintiff does not have to show certain ultimate success at trial. Instead, a party must make an initial presentation of support for the elements of a claim, after which "the inquiry becomes a 'sliding scale' analysis" where all considerations are weighed together, and potential First Amendment injuries to a plaintiff are given relatively greater weight. *Joelner, supra, loc. cit.*

The substantive law in this case is found in federal case law addressing the First and Fourteenth Amendments to the United States Constitution,[3] and in the express language of the Illinois Religious Freedom Restoration Act ("Illinois RFRA"). Plaintiffs have a substantial likelihood of success on the merits of their claims.

**1.  EO 2020-10, and its purported "continuation" in EO 2020-18, violates the Illinois Religious Freedom Restoration Act.**

The purpose of the Illinois Religious Freedom Restoration Act is as follows:

To restore the compelling interest test as set forth in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and *Sherbert v. Verner*, 374 U.S. 398 (1963), and to guarantee that a

---

[3] The First Amendment provides in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech . . ." U.S. Const. am. 1. The free speech clause has been "incorporated" by the Fourteenth Amendment and made applicable against the states. *E.g., Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 398 (4th Cir. 2005) (citing *West Virginia v. Barnette*, 319 U.S. 624, 642 (1943)).

> test of compelling governmental interest will be imposed on all State and local (including home rule unit) laws, ordinances, policies, procedures, practices, and governmental actions in all cases in which the free exercise of religion is substantially burdened.

775 ILCS 35/10(b)(1).

Illinois RFRA thus expressly rejected the holding of *Employment Division v. Smith*, 494 U.S. 872 (1990), that a court analyzing the propriety of government action substantially burdening the free exercise of religion must inquire whether the action is taken pursuant to a neutral law of general application. Under Illinois RFRA, the only questions to be asked are (1) Does the governmental action substantially burden the free exercise of religion? and (2) Is the governmental action "in furtherance of a compelling governmental interest and … the least restrictive means of furthering that compelling governmental interest." 775 ILCS 35/15.

Plaintiffs are a church and its pastor. They have been ordered by the government not to adjust their practices but to entirely cease all religious operations and activities, stop travel to religious activities, and close their church facility. Complaint, ¶¶ 24-33. The Executive Orders don't "substantially burden" Plaintiffs' free exercise, they ban it outright. By prohibiting all gatherings, the Executive Orders prevent the Church from functioning as a church.

The burden then shifts to Defendants to show that their actions are the least restrictive means to further a compelling state interest. Those least restrictive means must be narrowly tailored to the circumstances: Defendants cannot meet that heavy burden.

As the federal District Court for the District of Kansas reasoned in granting a TRO in a case involving gubernatorial orders strikingly similar to those at issue here, orders that prohibit "gatherings of more than ten congregants or parishioners in the same building or confined or enclosed space" indisputably substantially burden the free exercise of religion. Yet,

7

> Defendant [Governor of Kansas] has not argued that mass gatherings at churches pose unique health risks that do not arise in mass gatherings at airports, offices, and production facilities. Yet the exemption for religious activities has been eliminated while it remains for a multitude of activities that appear comparable in terms of health risks.

*First Baptist Church v. Kelly*, No. 20-1102-JWB (D. Kan. April 18, 2020), at 13-15. (A copy of that opinion is attached B).

While protecting the public health may be a compelling interest, courts must "scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Burwell v. Hobby Lobby*, 573 U.S. 682, 726–27 (2014). "[B]roadly formulated" interests and generalized speculations or assertions are not compelling. *See, Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). Moreover, "a law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547.

Closing church buildings and forbidding religious gatherings and ministries indisputably burdens the free exercise of religion. Simultaneously allowing similar secular and commercial premises that attract similarly sized or larger gatherings to stay open shows that such closures do not further "a compelling governmental interest… [by] the least restrictive means." 775 ILCS 35/15. There is no basis, much less a compelling one, to declare churches "non-essential" and shut them down entirely, while declaring a veritable laundry list of businesses, healthcare providers, professional offices, retail stores, and more to be "essential" and allowed open.

Moreover, there is no basis, much less a compelling one, to forbid Illinoisans from leaving their homes to attend churches or religious gatherings while allowing them to do so for "outdoor activity" or for a host of other alleged "essential" activities. In the announced upcoming executive order, by popular request of the residents of Illinois, Defendant Pritzker has added dog

8

grooming, golf, and fishing to the list of "essential" activities, but church and religious gatherings remain illegal, with no projected end in sight. *See,* Complaint, Exh. B.

Further, there is no basis, much less a compelling one, to place a total ban on religious gatherings of any number outside a household (as allegedly "non-essential"), while placing no numerical constraint at all on attendance at alleged "essential businesses and operations," such as retail businesses, including the state's liquor stores and big box stores, manufacturing facilities, and the like. Complaint, ¶¶ 51-55 & Exh. A, EO 2020-10, sec. 1, par. 7.

Particularly as to the liquor stores, those stores often are smaller, with employees and patrons in close proximity, not socially distant. And while the big box stores and manufacturing facilities may be larger, individuals stay inside those facilities for much longer periods of time, and at least as to the stores, social distancing may be difficult or merely not enforced. *Id.* And the act of a pastor providing one-on-one or small group religious counseling and prayer is physically (though not necessarily spiritually) identical to a mental health or substance abuse provider providing one-on-one or small group counseling or therapy. *Id*. If secular counseling and therapy can be performed safely, there is no reason why religious counseling and prayer can't be.

Insofar as Defendants take the position that shutting down all religious services and gatherings across Illinois for months is required to slow the spread of COVID-19, the veritable cornucopia of exemptions from the Executive Orders' general prohibitions would clearly endanger the public in a "similar or greater degree" as plaintiffs' religious services. *Lukumi*, 508 U.S. at 543. The underinclusion of the Order is thus "substantial, not inconsequential." *Id*.

Defendants' forced closure of plaintiffs' church building and ban on religious gatherings, including religious prayer and counseling, by the Executive Orders and "Cease and Desist Notice" violates Illinois RFRA.

### 2. EO 2020-10, and its purported "continuation" in EO 2020-18, violates the Free Exercise Clause.

The Free Exercise Clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. am. 1.[4] This clause "has been applied to the States through the Fourteenth Amendment." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (*citing Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)).

"Under the Free Exercise Clause of the Constitution, the 'general proposition' is 'that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.'" *Redemption Cmty. Church v. City of Laurel, Maryland*, 333 F. Supp. 3d 521, 536 (D. Md. 2018) (quoting *Church of the Lukumi Babalu Aye,* 508 U.S. at 531). "In contrast, laws that are not neutral or generally applicable are subject to strict scrutiny and must be justified by a compelling governmental interest that is advanced in the least restrictive means available." *Id*. (citing *Lukumi*); *see also Emp't Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990). EOs 2020-10 and 2020-18, and the announced upcoming EO, are neither laws of general applicability nor neutral.

The Supreme Court counseled in *Lukumi* that "[f]acial neutrality is not determinative." The Court explained: "The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause 'forbids subtle departures from neutrality,' *Gillette v. United*

---

[4] In addition to their federal First Amendment claims plaintiffs have asserted claims under the corollary provisions of the Illinois Bill of Rights. Under the "limited lockstep" analytical approach that the Illinois Supreme Court takes to construing those provisions, those provisions will be construed at least as broadly as the U.S. Supreme Court construes their federal exemplars, unless there is plain language in the Illinois provisions requiring more demanding standards of government conduct than the federal corollaries. *City of Chicago v. Alexander*, 2017 IL 120350, at par. 31. Plaintiffs' state constitutional claims, therefore, have the same or greater likelihood of success on the merits than their federal constitutional claims.

*States*, 401 U.S. 437, 452, 91 S.Ct. 828, 837, 28 L.Ed.2d 168 (1971), and 'covert suppression of particular religious beliefs,' *Bowen v. Roy*, *supra*, 476 U.S. [693], at 703, 106 S.Ct., at 2154 [(1986)](opinion of Burger, C.J.).)." *Id.*, 508 U.S. at 534.

Defendant Pritzker has deliberately swept up churches and religious gatherings with his orders and his public statements, declaring them "non-essential" and refusing even the most innocuous drive-in worship services, all of which is itself indicative of discriminatory intent. When coupled with Defendants' lack of limits on gatherings at "essential" entities like Walmart, Menards, Snak King, liquor stores, and the like, the inference is even greater. The Order is therefore not neutral, but discriminatory in effect.

Even if not intentionally discriminatory, the Executive Orders' decisions as to which businesses are "essential" and which are not, and which activities are allowed and which are not, is *at best* arbitrary. The Executive Orders are not laws of general applicability. Rather, they are a hodgepodge of special rules, exceptions, and provisions. As such, strict scrutiny applies and it must be justified by a compelling government interest. *Church of the Lukumi Babalu Aye*, 508 U.S. at 531. Defendants cannot meet this high standard.

Finally, the fact that governmental actors may be dealing with emergent circumstances does not change the analysis. The seminal case dealing with constitutional rights in the midst of contagion, *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11 (1905), predates modern *Carolene Products* style constitutional analysis, but the Supreme Court even then recognized that a government "enactment or regulation, even if based on the acknowledged police powers of a state, must always yield in case of conflict … with any right which [the U.S. Constitution] gives or secures." *Jacobson*, 197 U.S. at 25 (1905). A government actor's exercise of emergency powers "is not conclusive or free from judicial review," and normal methods of constitutional

analysis must still be applied. *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971); *accord On Fire Christian Center v. Fischer*, No. 3:20-cv-264-JRW, 2020 WL 1820249 at *15 (W.D. Ky. April 11, 2020) ("[E]ven under *Jacobson*, constitutional rights still exist. Among them is the freedom to worship as we choose") (A copy of the opinion in *On Fire Christian Center v. Fischer* is attached as Exhibit C).

Even if *Jacobson* applies against Plaintiffs' First Amendment claim,[5] the sort of sweeping, drastic, and crude measures that may have arguably been excusable under emergency powers on March 9 or March 20 cannot persist to today, April 30. While the epidemic may not be concluded, it is clearly under much better control than it was a month and a half ago. *See, e.g.,* Complaint, ¶¶ 69-72.

In short, defendants can find no refuge in *Jacobson* and cannot meet its high burden under strict scrutiny. Plaintiffs are very likely to succeed on the merits.

### 3. EO 2020-10, and its purported "continuation" in EO 2020-18, is *Ultra Vires*.

Defendant Pritzker's EO 2020-10 ceased to have legal effect on April 7. The authority that empowers the Governor of Illinois to employ emergency powers, the Emergency Management Agency Act, explicitly limits the duration of the exercise of those powers to "a period not to exceed 30 days" from the proclamation of a state of emergency. 20 ILCS 3305/7. Defendant Pritzker made such a declaration by gubernatorial proclamation on March 9, 2020—and consequently EO 2020-10 limited itself to an effective period ending April 7, 2020. Any action by an agent of Illinois government to continue to enforce its terms is *ultra vires*.

Defendant Pritzker has, however, arrogated to himself the power to "continue" the duration of those emergency powers by issuing a second gubernatorial proclamation, on April 1,

---

[5] Illinois RFRA provides an independent statutory ground for relief, apart from the First Amendment.

12

that purportedly "continues the Governor's authority to exercise all … emergency powers." (At section 1). A subsequent EO, number 2020-18, taking advantage of that unilaterally arrogated "continuation," correspondingly extended the provisions of prior EO 2020-10 through the end of April, 2020, well beyond the statutory 30-day expiration of emergency powers.

It is only by operation of these *extended* emergency powers that the Stephenson County Defendants continue to claim the "Cease and Desist Notice" served on plaintiffs remains in effect, and to claim the authority to enforce the provision of EO 2020-10 against Plaintiffs.

But by statutory command there ceased to be any basis for gubernatorial emergency action after April 7 [20 ILCS 3305/7], and the purported bases for defendants' orders to plaintiffs to keep their church building closed and to forgo their Sunday morning services have no support in Illinois law.

### 4. Defendant Pritzker has no authority to quarantine or isolate or to close churches under the IEMA Act. Only the IDPH Act provides that authority.

The Illinois Department of Public Health Act ("IDPH Act") provides the exclusive remedy for quarantine and isolation and closures, along with ensuring the due process rights of those who are subject to such measures. *See*, 20 ILCS 2305/2(c) ("Except as provided in this Section, no person or a group of persons may be ordered to be quarantined or isolated and no place may be ordered to be closed and made off limits to the public except with the consent of the person or owner of the place or upon the prior order of a court of competent jurisdiction.") & 77 Ill.Adm.Code 690.1330 (describing process for quarantine, isolation, and closure). The IDPH Act further provides that IDPH has "supreme authority in matters of quarantine and isolation." 20 ILCS 2305/2(a). IDPH alone may order quarantines and isolations of individuals or groups or closures of places, "to prevent the probable spread of a dangerously contagious or infectious disease." 20 ILCS 2305/2(b).

13

Defendant Pritzker thus lacks authority under the IEMA Act to impose a quarantine or isolation on Illinois residents, or to order shutdowns of Illinois churches. And at the very least, if he argues an ability to commandeer IDPH to execute his orders, then he must provide the due process rights enshrined in the IDPH Act and its enabling rules before quarantining Plaintiffs and closing the Church.

### B.    Likelihood of Irreparable Harm to Plaintiffs.

To meet the second criterion for preliminary relief, Plaintiffs must show a substantial likelihood that irreparable harm will occur if injunctive relief is not granted. The danger of irreparable injury to Plaintiffs resulting from Defendants' construction and application of the Executive Orders here is actual and immediate. Indeed, Plaintiffs have had *all* their in-person religious services and ministries shut down.

It is well established that "[t]he loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiffs therefore satisfy the second criterion for injunctive relief.

### C.    Balance of Harms if the Requested Relief is Granted.

Upon a finding of irreparable harm to Plaintiffs, the next step is to balance the likelihood of irreparable harm to Plaintiffs from failure to grant interim relief against the likelihood of harm to Defendants from the grant of such relief. In this case, the likelihood of harm to Plaintiffs greatly exceeds any potential for harm to Defendants. Plaintiffs have suffered irreparable harm to their fundamental constitutional rights. By contrast, Defendants will incur no real harm to any legitimate government interest, as noted above. Plaintiffs are perfectly willing to abide by all applicable (and constitutional) guidance in holding their services and religious gatherings. But Plaintiffs should not be penalized for a hostile government's refusal to issue such guidance, and

any burden or fault for lack of guidance for religious activities must fall squarely on Defendants. Thus, the "balance of hardships" tips decidedly in favor of Plaintiffs. *Joelner, supra*, 378 F.3d at 620 ("there can be no irreparable harm to [a governmental actor] when it is prevented from enforcing an unconstitutional [law]").

### D. The Public Interest is Furthered by Entry of an Injunction.

Given the irreparable injury to Plaintiffs, the lack of any harm to Defendants' legitimate interests, and the critical nature of the First Amendment rights at issue, the public interest is best served by issuance of a preliminary injunction. "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir.2006); *accord Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir.1996) (where law violates the First Amendment "the public interest was not disserved by an injunction preventing its implementation"). Plaintiffs therefore satisfy the public interest prong as well.

## CONCLUSION

Accordingly, the Court should grant Plaintiffs' motion, enjoin Defendants applying EOs 2020-10 and 2020-18, and the announced upcoming executive order, against Plaintiffs' church services and religious gatherings and ministries, and grant such other and further relief to which Plaintiffs are entitled.

Respectfully submitted,

/s/ Martin Whittaker

Peter Breen
Thomas Brejcha
Martin Whittaker
**THE THOMAS MORE SOCIETY**
309 West Washington, Suite 1250
Chicago IL 60606

15

312-782-1680
pbreen@thomasmoresociety.org
tbrejcha@thomasmoresociety.org
mwhittaker@thomasmoresociety.org
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served, via email, copies of the foregoing on the defendants, this 30th day of April, 2020, addressed as follows:

Benjamin M. Jacobi
bjacobi@okgc.com
*Attorney for Defendants Snyders and Beintema*

sschaible@yahoo.com
*Defendant Steve Schaible*

Sarah Hunger
Deputy Solicitor General, office of the Illinois Attorney General
Shunger@atg.state.il.us
*Attorney for Defendant Pritzker*

/s/Martin Whittaker