## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| STEPHEN CASSELL and THE BELOVED CHURCH, an Illinois not-for-profit corporation, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 20 C 50153 |
| DAVID SNYDERS, Sheriff of Stephenson County, JAY ROBERT PRITZKER, Governor of Illinois, CRAIG BEINTEMA, Administrator of the Department of Public Health of Stephenson County, STEVE SCHAIBLE, Chief of Police of the Village of Lena, Illinois, | ) ) ) ) ) ) ) ) ) | Judge John Z. Lee |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

So far, over 60,000 Americans have died from contracting COVID-19. That is more than the number of people who perished during the 9/11 terrorist attacks, Pearl Harbor, and the Battle of Gettysburg combined. Hoping to slow the pathogen's spread, governors and mayors across the country have implemented stay-at-home orders. While those orders have already saved thousands of lives, they come at a considerable cost. In Illinois, as in other states, the orders have interfered with the ability of residents to work, learn, and worship.

This case is about whether those restrictions are consistent with the religious freedoms enshrined in the Federal Constitution and in Illinois law. Every Sunday for the past five years, members of the Beloved Church have gathered with their

pastor, Stephen Cassell, to pray, worship, and sing. Since Governor Pritzker's first stay-at-home order went into effect, however, the Beloved Church has been forced to move those services online. And, in the intervening weeks, the Governor has issued additional orders, extending the restrictions.

Convinced that these orders impermissibly infringe on their religious practices, Cassell and the Beloved Church have sued Pritzker, Stephenson County Sheriff David Snyders, Stephenson County Public Health Administrator Craig Beintema, and Village of Lena Police Chief Steve Schaible. In particular, Plaintiffs allege that the stay-at-home orders violate the First Amendment's Free Exercise Clause, Illinois's Religious Freedom Restoration Act ("RFRA"), 775 Ill. Comp. Stat 35/15, the Emergency Management Agency Act ("EMAA"), 20 Ill. Comp. Stat. 3305/7, and the Illinois Department of Health Act ("DHA"), 20 Ill. Comp. Stat. 2305/2(a).

Plaintiffs hope to return to their church on May 3, 2020, to worship without limitations. To that end, on April 30, 2020, they filed a motion asking the Court to enter a temporary restraining order and a preliminary injunction preventing Defendants from enforcing the stay-at-home orders. Given the time constraints, the Court ordered expedited briefing; Defendants filed their responses to the motion on May 1, 2020, and Plaintiffs submitted their reply on May 2, 2020.

The Court understands Plaintiffs' desire to come together for prayer and fellowship, particularly in these trying times. It is not by accident that the right to exercise one's religious beliefs is one of the core rights guaranteed by our

Constitution. And whether it be the Apostles and Jesus gathering together to break bread and share wine on the night before his crucifixion (Luke 22:7-23), or Peter addressing the many at Pentecost and forming the first church (Acts 2:14-47), Christian tradition has long cherished communal fellowship, prayer, and worship.

But even the foundational rights secured by the First Amendment are not without limits; they are subject to restriction if necessary to further compelling government interests—and, certainly, the prevention of mass infections and deaths qualifies. After all, without life, there can be no liberty or pursuit of happiness.

Recently, after this lawsuit was filed, Governor Pritzker issued a new order, recognizing the free exercise of religion as an "essential activity." April 30 Order § 2, ¶ 5(f), ECF No. 26-1. The order now states that worshippers may "engage in the free exercise of religion" so long as they "comply with Social Distancing Requirements" and refrain from "gatherings of more than ten people." *Id.* Furthermore, "[r]eligious organizations and houses of worship are encouraged to use online or drive-in services [which are not limited to ten people] to protect the health and safety of their congregants." *Id.*

The Court is mindful that the religious activities permitted by the April 30 Order are imperfect substitutes for an in-person service where all eighty members of Beloved Church can stand together, side-by-side, to sing, pray, and engage in communal fellowship. Still, given the continuing threat posed by COVID-19, the Order preserves relatively robust avenues for praise, prayer and fellowship and passes constitutional muster. Until testing data signals that it is safe to engage

more fully in exercising our spiritual beliefs (whatever they might be), Plaintiffs, as Christians, can take comfort in the promise of Matthew 18:20—"For where two or three come together in my name, there am I with them."

For the reasons below, Plaintiffs' motion for a temporary restraining order and preliminary injunction is denied.

## I.  <u>Preliminary Factual Findings</u>[1]

### A.  The Pandemic

COVID-19 is "a novel severe acute respiratory illness" that spreads rapidly "through respiratory transmission."  April 30 Order at 1, ECF No. 26-1 ("April 30 Order" or "Order").  Making response efforts particularly daunting, asymptomatic individuals may carry and spread the virus, and there is currently no known vaccine or effective treatment.  *Id.*; Pritzker Resp. Br. at 12, ECF No. 26.  The virus has killed hundreds of thousands, infected millions, and disrupted the lives of nearly everyone on the planet.  April 30 Order at 1–2.  In Illinois alone, at least 2,350 individuals have perished from the pathogen, with more than 50,000 infected. *Id.* at 2.

### B.  The Stay-at-Home Orders

To slow the spread of COVID-19, Governor Jay R. Pritzker issued a stay-at-home order on March 20, 2020.  ECF No. 1-1.  He extended that order two weeks

---

[1]  "[T]he district judge, in considering a motion for preliminary injunction . . . must make factual determinations on the basis of a fair interpretation of the evidence before the court."  *Darryl H. v. Coler*, 801 F.2d 893, 898 (7th Cir. 1986).  The facts summarized here derive from Plaintiffs' complaint, the parties' briefs supporting and opposing the motion, and the accompanying exhibits; none are materially disputed.

later, before issuing a new directive with modified restrictions at the end of April. *See* April 30 Order. In substance, these orders direct Illinoisans to practice what experts call "social distancing." That means limiting activity outside the home, staying at least six feet apart from others, and refraining from congregating in groups of more than ten. *Id.* § 1. To facilitate these efforts, businesses deemed non-essential have been required to cease operations, and schools have been forced to close their doors. The Governor has determined that, if the orders were not in effect, "the number of deaths from COVID-19 would be between ten to twenty times higher." April 30 Order at 2.

At the same time, the stay-at-home orders have resulted in significant hardships for many individuals and their families. With schools closed, families have had to care for their children and oversee their education on a full-time basis. With businesses shuttered, many Illinoisans now find themselves furloughed or fired. And with large gatherings prohibited, religious groups have had to refrain from their usual activities.

In an effort to alleviate some of those concerns, the April 30 Order, which is effective until the end of May, provides that Illinoisans may leave their homes to perform certain "Essential Activities." April 30 Order § 1, ¶ 5. Though the Order did not initially include religious events in its list of Essential Activities, it was amended shortly after Plaintiffs filed this lawsuit and their associated request for a temporary restraining order. *Compare* ECF No. 1-3, *with* ECF No. 26-1. As amended, the Order clarifies that worshippers may "engage in the free exercise of

religion" so long as they "comply with Social Distancing Requirements" and refrain from "gatherings of more than ten people." April 30 Order § 2, ¶ 5(f). In doing so, "[r]eligious organizations and houses of worship are encouraged to use online or drive-in services to protect the health and safety of their congregants." *Id.*

## C.    The Beloved Church

Pastor Stephen Cassell formed the Beloved Church, an evangelical Christian organization, to promote "the truths of God's unconditional Love, amazing Grace, and majestic Restoration." Compl. ¶ 24, ECF No. 1. Cassell is passionate about "shar[ing] the love of God with [his] congregants, who form what [he] believe[s] is [a] Church family." *Id.* ¶ 25.

To that end, Cassell leads Sunday services at the Church's building in Lena, Illinois. *Id.* ¶ 27. On a typical Sunday, about eighty worshippers attend. *Id.* During each service, Cassell reads from scripture, delivers a sermon, and leads the congregation in prayer and song. *Id.* ¶ 28. After the ceremony, he encourages worshippers to engage in informal conversation with each other, building fellowship and community. *Id.* ¶ 29. Plaintiffs view Sunday prayer services as "the central religious rites of the Church congregation." *Id.* ¶ 31.

In late March, the Stephenson County Department of Public Health served Cassell with a cease-and-desist notice. *Id.* ¶ 48. It declared that the Beloved Church was required to adhere to the guidelines elaborated in the stay-at-home orders. *Id.* ¶ 49. For example, the notice stated that religious gatherings of over ten people would not be permitted. *Id.* ¶ 49. It went on to warn that violators "may

6

be subject to additional civil and criminal penalties." *Id.* ¶ 49. Fearing fines and prosecution, the Beloved Church has refrained from holding Sunday services in person, *id.* ¶ 50, and, like many religious organizations, Cassell has instead held services online on various forums, including Facebook Live and YouTube.[2]

Viewing these remote services as "a violation of the Church's existence as a Christian congregation," Plaintiffs take aim at Governor Pritzker's most recent Order. Cassell Decl. ¶ 3, ECF No. 34. To support this challenge, Plaintiffs have submitted with their reply brief a declaration by Cassell stating that the Beloved Church's parking lot cannot accommodate drive-in services; that typically 10 to 15 family units attend a service, most of which consist of many members; that the church's facility can seat 15 family units with six feet of distance between each unit; and that Cassell will supply all attendees with masks (or other face coverings) and hand sanitizer. *Id.* ¶¶ 5, 8–10, 16.

---

[2]     For example, in recent weeks, Cassell has presented a series of sermons titled "Corona-Lie," where he has expressed skepticism regarding the extent of the COVID-19 crisis, as well as the government's motives in responding to it. *See, e.g.*, Beloved Church Media, *Sunday March 15, 2020: Corona-Lie (Pastor Steve Cassell)* at 38:35, YOUTUBE, https://www.youtube.com/watch?v=QJix0dCxhGQ&t=1699s ("Why don't we shut the country down for the 2500 people that have died from [Corona Beer]? Because it doesn't fit the narrative. I don't know if you realize this, but you are being absolutely manipulated and controlled by a system that wants you to believe what it tells you."). *See Goplin v. WeConnect, Inc.*, 893 F.3d 488, 491 (7th Cir. 2018) (approving the district court taking judicial notice of a party's website in deciding a motion where the counterparty cited the website in its response brief).

## II.      Legal Standard

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks omitted). A party seeking a preliminary injunction must show that (1) its case has "some likelihood of success on the merits," (2) it has "no adequate remedy at law", and (3) "without relief it will suffer irreparable harm." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018). As part of the preliminary-injunction analysis, a district court may consider a nonmovant's defenses in determining the movant's likelihood of success on the merits. *See Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 308 (7th Cir. 2010).

If the moving party meets these threshold requirements, the district court "weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Ezell v. City of Chi.*, 651 F.3d 684, 694 (7th Cir. 2011). "The standards for granting a temporary restraining order and a preliminary injunction are the same." *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 (N.D. Ill. 2019) (citation omitted).

### III.   Mootness, Standing, and Ripeness

As a threshold matter, Defendants question whether Article III authorizes this Court to adjudicate Plaintiffs' claims.  In doing so, they articulate three distinct theories.  First, Governor Pritzker says that Plaintiffs' motion is moot in light of the new provisions in the April 30 Order relating to religious activities.  Second, Sheriff Snyders, Public Health Administrator Beintema, and Police Chief Schaible ("County and Village Defendants") submit that Plaintiffs lack standing to sue. Finally, the same group of Defendants argues that this case is not ripe for review.

### A.   Mootness

To begin with, Governor Pritzker contends that Plaintiffs' claims have been mooted by the post-complaint issuance of the April 30 Order, which supersedes EO 2020-10 and EO 2020-18, and provides a new framework for religious organizations starting May 1, 2020.  To the extent that Plaintiffs seek declaratory and injunctive relief with respect to EO 2020-10 and EO 2020-18, without regard to the new provisions in the April 30 Order, their claims are indeed moot.  *See N.Y. State Rifle & Pistol Ass'n, Inc. v. City of N.Y*, No. 18-280, 2020 WL 1978708, at *1 (U.S. Apr. 27, 2020) (holding that a request for declaratory and injunctive relief was mooted by amendment of the statute).

But to the extent that Plaintiffs assert residual claims that apply equally to the April 30 Order, those claims are not moot.  *Cf. id.* (remanding residual claims based on the new statute for further proceedings); *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 482 (1990) (same).  "[A] case does not become moot as long as the parties

9

have a concrete interest, however small, in the litigation[ ] . . . ." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 665 (2016). And it is clear that Plaintiffs take umbrage at the restrictions on religious gatherings imposed by the April 30 Order, including the ten-attendee limit. *See* Compl. ¶¶ 27–31. Accordingly, Governor Pritzker's argument that the case is moot fails.

## B.    Standing

Next, the County and Village Defendants contend that Plaintiffs lack standing. To establish standing, a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Defendants focus their fire on the first element.

As a general rule, "[a]n injury sufficient to satisfy Article III must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). But an "allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Id.* (emphasis deleted and internal quotation marks omitted). "[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights" *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007); *Sequoia Books, Inc. v. Ingemunson*, 901 F.2d 630,

640 (7th Cir. 1990) (recognizing that "special flexibility, or 'breathing room,' . . . attaches to standing doctrine in the First Amendment context") (citation omitted).

*Babbitt v. United Farm Workers National Union* is instructive. 442 U.S. 289 (1979). In that case, the Supreme Court held that the plaintiffs could bring a pre-enforcement action because they alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exist[ed] a credible threat of prosecution thereunder." *Id.*, 442 U.S. at 298. The statute at issue made it illegal to encourage consumers to boycott an "agricultural product . . . by the use of dishonest, untruthful and deceptive publicity." *Id.* at 295. And the plaintiffs pleaded they had "actively engaged in consumer publicity campaigns in the past" and "inten[ded] to continue to engage in boycott activities" in the future. *Id.* Even though the plaintiffs did not "plan to propagate untruths," they maintained that "'erroneous statement is inevitable in free debate,'" and this was sufficient to establish standing. *Id.* (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964)).

As in *Babbitt*, Plaintiffs have alleged an Article III injury. According to Plaintiffs, Beintema issued and Snyders' deputy sheriff served a cease-and-desist notice on March 31, 2020, advising Plaintiffs that the Department of Public Health could issue a closure order if they did not adhere to Governor Pritzker's Executive Order 2020-10. Compl. ¶ 47. Although the notice references Executive Order 2020-10, the allegations create a reasonable inference that the notice also would apply to

11

the April 30 Order, which prohibits "gatherings of more than ten people." April 30 Order § 2, ¶ 5(f).

Moreover, the notice stated that "police officers, sheriffs and all other officers in Illinois are authorized to enforce such orders. In addition to such an order of closure . . . you may be subject to additional civil and criminal penalties." *Id.*, Ex. C, Cease and Desist Notice, ECF No. 1-3. Along the same lines, the April 30 Order expressly warns that "[t]his Executive Order may be enforced by State and local law enforcement pursuant to, *inter alia*, Section 7, Section 15, Section 18, and Section 19 of the Illinois Emergency Management Agency Act, 20 ILCS 3305." April 30 Order § 2, ¶ 17.

For their part, Plaintiffs state that, for the past five years, they have held church services with eighty people in attendance, and they intend to hold a service on Sunday, May 3, 2020. *Id.* ¶¶ 11, 27. Plaintiffs further assert that, based on the cease-and-desist notice, they fear arrest, prosecution, fines, and jail time if the full congregation attends the service. *Id.* ¶ 50. And, although Snyders states that he does not intend to enforce the April 30 Order against Plaintiffs if they go through with their plans to gather on May 3, 2020, he does not provide any assurance that the Order will not be enforced thereafter. Therefore, based on the record, the Court finds that Plaintiffs face "a credible threat of prosecution," *Babbitt*, 442 U.S. at 298, and the allegations in the complaint are sufficient to state an injury-in-fact.

12

### C.     Ripeness

In the alternative, the County and Village Defendants argue that Plaintiffs' claims do not satisfy the Article III requirement of ripeness.  But when a court has determined that a plaintiff has sufficiently alleged an Article III injury, a request to decline adjudication of a claim based on prudential ripeness grounds is in "some tension" with the Supreme Court's "reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (internal quotation marks omitted); *see Susan B. Anthony List*, 573 U.S. at 167.

Be that as it may, ripeness is satisfied here.  To determine ripeness, courts examine (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration."  *Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cty.*, 325 F.3d 879, 882 (7th Cir. 2003).  First, Plaintiffs' claims raise purely legal questions that are typically fit for judicial review, and further factual development will provide little clarification as to these issues.  *See Susan B. Anthony List*, 573 U.S. at 167; *Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011); *Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cty.*, 325 F.3d 879, 882 (7th Cir. 2003).

Second, denying judicial review imposes a not-insignificant hardship on Plaintiffs by forcing them to choose between refraining from congregating at their church and engaging in assembly while risking civil fines and criminal penalties.

13

Accordingly, the County and Village Defendants' argument that the Plaintiffs claims are unripe are unavailing. With that, the Court turns to the merits of Plaintiffs' motion.

## IV.    <u>Likelihood of Success on the Merits</u>

Plaintiffs challenge the April 30 Order on two grounds. First, they maintain that it runs afoul of the First Amendment's Free Exercise Clause. Second, they insist that the Order violates three state statutes—the Illinois Religious Freedom Restoration Act, the Emergency Management Agency Act, and the Illinois Department of Health Act.

## A.    **Free Exercise Claim**[3]

### 1.    **Government Authority During a Public Health Crisis**

The Constitution does not compel courts to turn a blind eye to the realities of the COVID-19 crisis. For more than a century, the Supreme Court has recognized that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 27 (1905); s*ee Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) ("The right to practice religion freely does not include liberty to expose the community . . . to communicable disease."). During an epidemic, the *Jacobson* court explained, the traditional tiers of constitutional scrutiny do not apply. *Id.*; *see*

---

[3]    Plaintiffs' motion focuses on their claim under the Free Exercise Clause. In the reply brief, however, they also argue that the Order violates the First Amendment's Free Speech and Freedom of Assembly provisions. But, because Plaintiffs failed to include these arguments in their opening brief and offer them only in reply, the arguments are waived as a matter of fairness. *See Wonsey v. City of Chi.*, 940 F.3d 394, 399 (7th Cir. 2019).

*In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020). Under those narrow circumstances, courts only overturn rules that lack a "real or substantial relation to [public health]" or that amount to "plain, palpable invasion[s] of rights." *Jacobson*, 197 U.S. at 31. Over the last few months, courts have repeatedly applied *Jacobson*'s teachings to uphold stay-at-home orders meant to check the spread of COVID-19. *See, e.g.*, *Abbott*, 954 F.3d at 783–85; *Gish v. Newsom*, No. EDCV20755JGBKKX, 2020 WL 1979970, at *5 (C.D. Cal. Apr. 23, 2020).

This is not to say that the government may trample on constitutional rights during a pandemic. As other judges have emphasized, *Jacobson* preserves the authority of the judiciary to strike down laws that use public health emergencies as a pretext for infringing individual liberties. *See, e.g.*, *Abbott*, 954 F.3d at 800 (Dennis, J., dissenting) (citing *Jacobson*, 197 U.S. at 28–29)). Furthermore, *Jacobson*'s reach ends when the epidemic ceases; after that point, government restrictions on constitutional rights must meet traditionally recognized tests. And so, courts must remain vigilant, mindful that government claims of emergency have served in the past as excuses to curtail constitutional freedoms. *See, e.g., Korematsu v. United States*, 323 U.S. 214 (1944), *abrogated by Trump v. Hawaii*, -- U.S. --, 138 S. Ct. 2392, 2423 (2018).

Today, COVID-19 threatens the lives of all Americans. The disease spreads easily, causes severe and sometimes fatal symptoms, and resists most medical interventions. April 30 Order at 1–2. When Governor Pritzker issued the amended stay-at-home rules, thousands of Illinoisans had perished due to the disease. *Id.*

15

Based on the plethora of evidence here, the Court finds that COVID-19 qualifies as the kind of public health crisis that the Supreme Court contemplated in *Jacobson* and that the coronavirus continues to threaten the residents of Illinois.

While Plaintiffs acknowledge the seriousness of the pathogen, they insist that the stay-at-home orders have successfully flattened the curve of active COVID-19 cases, eliminating the need for continued precautions. But, to borrow an analogy from Justice Ginsburg, that "is like throwing away your umbrella in a rainstorm because you are not getting wet." *Shelby Cty., Ala. v. Holder*, 570 U.S. 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting). Without the stay-at-home restrictions, the Governor estimates that ten to twenty times as many Illinoisans would have died and that the state's hospitals would be overrun. April 30 Order at 2. Plaintiffs have failed to marshal any credible evidence that suggests otherwise.

As a fallback position, Plaintiffs portray the April 30 Order as "arbitrary" and "unreasonable." *Jacobson*, 197 U.S. at 28. Specifically, they claim that the Order subjects religious organizations to more onerous restrictions than their secular counterparts. But, as we shall shortly see, the Order adopts neutral principles that satisfy *Jacobson*'s reasonableness standard.

In sum, because the current crisis implicates *Jacobson*, and because the Order undoubtedly advances the government's interest in protecting Illinoisans from the pandemic, the Court finds that Plaintiffs have a less than negligible chance of prevailing on their constitutional claim.

16

### 2. Traditional First Amendment Analysis

Even if *Jacobson* were not to apply here, the Order nevertheless would likely withstand scrutiny under the First Amendment's Free Exercise Clause. That provision prevents the government from "plac[ing] a substantial burden on the observation of a central religious belief or practice" unless it demonstrates a "compelling government interest that justifies the burden." *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 631 (7th Cir. 2007). As the Supreme Court has elaborated, however, "neutral, generally applicable laws may be applied to religious practice even when not supported by a compelling government interest." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 (2014) (citing *Emp't Div. v. Smith*, 494 U.S. 872, 879–80 (1990)). In other words, a "neutral law of general applicability is constitutional if it is supported by a rational basis." *Ill. Bible Colleges Ass'n. v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017).

For the rational basis test to apply, the challenged law must be both neutral and generally applicable. The neutrality element asks whether "the object of the law is to infringe upon or restrict practices because of their religious motivation." *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 743 (7th Cir. 2015) (citing *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993)). The general applicability element "forbids the government from impos[ing] burdens only on conduct motivated by religious belief in a selective manner." *Listecki*, 780 F.3d at 743. As these definitions suggest, the neutrality and general applicability requirements usually rise or fall together.

17

In evaluating these two elements, courts draw on principles developed in the context of the Fourteenth Amendment's Equal Protection Clause. *See, e.g.*, *Lukumi*, 508 U.S. at 540 (instructing lower courts to "find guidance in our equal protection cases"). At its core, equal protection analysis hinges on whether "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon a particular group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). In keeping with that framework, courts apply the rational basis test to Free Exercise Clause claims, unless the challenged rule "fail[s] to prohibit nonreligious conduct that endangers the [government's] interests in a similar or greater degree" than religious conduct. *Lukumi*, 508 U.S. at 543.

*Lukumi* is instructive. There, the Supreme Court reviewed municipal ordinances that prescribed penalties for "any individual or group that kills, slaughters or sacrifices animals for any type of ritual." *Lukumi*, 508 U.S. at 527. In holding that "the object or purpose of [the challenged] law is the suppression of religion or religious conduct," the Court looked to three main factors. *Id*. at 533. First, it determined that the drafters of the ordinances displayed a "pattern" of animosity towards "Santeria worshippers," who practiced animal sacrifice. *Id*. at 542. Second, it recognized that "the ordinances [we]re drafted with care to forbid few killings but those occasioned by religious sacrifice." *Id*. at 543. Third, it concluded that the "ordinances suppress much more religious conduct than is

18

necessary in order to achieve the legitimate ends asserted in their defense." *Id*. at 536.

This case is different. For one, nothing in the record suggests that Governor Pritzker has a history of animus towards religion or religious people, and Plaintiffs do not argue otherwise. For another, the Order proscribes secular and religious conduct alike. *See, e.g.*, April 30 Order § 2, ¶ 3 (forbidding "any gathering of more than ten people"). Indeed, its limitations extend to most places where people gather, from museums to theaters to bowling alleys. *Id*. And finally, Plaintiffs have not established that the Order "suppress[es] much more religious conduct than is necessary" to slow the spread of COVID-19. *Lukumi*, 508 U.S. at 536. To the contrary, the April 30 Order expressly preserves various avenues for religious expression, including gatherings of up to ten people and drive-in services. April 30 Order § 2, ¶ 5(f). For these reasons, the Court concludes that the Order does not "impose special disabilities on the basis of . . . religious status." *Smith*, 494 U.S. at 877.

Neither of Plaintiffs' counterarguments is persuasive. First, they claim that the Order "targets . . . church services because it makes them the only Essential Activity effectively subject to the 10-person maximum requirement." But that argument rests on a misreading of the Order. In fact, the Order broadly prohibits "any gathering of more than ten people [other than members of the same household]. . . unless exempted by this Executive Order." April 30 Order § 2, ¶ 3.

19

And nothing in the Section that enumerates "Essential Activities" appears to exempt secular activities from that generally-applicable constraint. *Id*. § 2, ¶ 5.

It is true that the provision recognizing religious activities as essential reiterates the ten-person restriction. *Id*. ¶ 5(f). But, read as a whole, the Order appears to apply that limit to the other Essential Activities as well. For example, Section 2, ¶ 5 of the Order permits "individuals" to leave their homes in order to visit their doctors, pick up groceries, and travel to work at "Essential Businesses" (which must abide by their own additional restrictions). *Id*. ¶ 5(a)–(d). It also lists "hiking," "running," and "[f]ishing" as essential activities. *Id*. ¶ 5(c). In practice, those are pursuits that individuals normally perform alone or in small groups. By contrast, people of faith tend to gather for worship in much greater numbers, as Plaintiffs themselves acknowledge. Compl. ¶ 27. Understood in that context, it makes sense for Order to explicitly remind worshippers that they must abide by the prohibition on large groups.

Second, Plaintiffs complain that "grocery stores," "food and beverage manufacturing plants," and other "Essential Businesses" need not comply with the ten-person limitation.[4] April 30 Order § 2, ¶ 12(a), (b). If Walmart and Menards are allowed to host more than ten visitors, Plaintiffs' theory goes, then so should the

---

[4] At times, Plaintiffs also argue that the government does not enforce social distancing requirements as applied to Essential Businesses. *See* Pls.' Reply at 8. In support, Cassell states that he has observed social distancing violations while shopping at Menards and Walmart. Cassell Decl. ¶ 16. But limited, anecdotal instances of noncompliance contribute little to the inference that the "object or purpose" of the challenged order is to interfere with religious practices. *Lukumi*, 508 U.S. at 527.

Beloved Church. But the question is not whether any secular organization faces fewer restrictions than any religious organization. Rather, the question is whether secular conduct "that endangers the [government]'s interests in a similar or greater degree" receives favorable treatment. *Lukumi*, 508 U.S. at 543. Only then does different treatment signal that the government's "object" is to target religious practices. *Id*. at 533.

Contrary to Plaintiffs' suggestion, retailers and food manufacturers are not comparable to religious organizations. The avowed purpose of the Order is to slow the spread of COVID-19. As other courts have recognized, holding in-person religious services creates a higher risk of contagion than operating grocery stores or staffing manufacturing plants. *See, e.g.*, *Gish*, 2020 WL 1979970, at *6. The key distinction turns on the nature of each activity. When people buy groceries, for example, they typically "enter a building quickly, do not engage directly with others except at points of sale, and leave once the task is complete." *Id*. The purpose of shopping is not to gather with others or engage them in conversation and fellowship, but to purchase necessary items and then leave as soon as possible.[5]

By comparison, religious services involve sustained interactions between many people. During Sunday services, for example, Cassell encourages members of his congregation to "converse" and "build fellowship and morale." Compl. ¶ 29. Indeed, Plaintiffs view "informal conversations and fellowship" as "essential parts of

---

[5]    Indeed, among other things, the Order requires retail stores that are designated as Essential Businesses to set up aisles to be one-way "to maximize spacing between customers and identify the one-way aisles with conspicuous signage and/or floor markings." April 30 Order § 2.

a functioning Christian congregation." *Id.* Given that religious gatherings seek to promote conversation and fellowship, they "endanger" the government's interest in fighting COVID-19 to a "greater degree" than the secular businesses Plaintiffs identify. *Lukumi*, 508 U.S. at 543.

This distinction finds support in the record. There are many examples where religious services have accelerated the pathogen's spread. For instance, of eighty congregants who attended a Life Church service in Illinois on March 15, ten contracted the disease, and at least one died. *See* Anna Kim, "Glenview church hit by COVID-19 is now streaming service online, as pastor remembers usher who died of disease," *Chicago Tribune* (Mar. 31, 2020). Along the same lines, South Korea tracked more than 5,000 individual cases to a single church. *See* Youjin Shin, Bonnie Berkowitz, Min Joo-Kim, "How a South Korean church helped fuel the spread of the coronarvirus," *Washington Post* (Mar. 25, 2020). And, near Seattle, at least forty-five individuals who attended a church choir gathering were diagnosed with COVID-19. *See* Richard Read, "A choir decided to go ahead with rehearsal. Now dozens have COVID-19 and two are dead," *Los Angeles Times* (Mar. 29, 2020). In comparison, Plaintiffs have failed to identify a grocery store or liquor store that has acted as a vector for the virus.

A more apt analogy is between places of worship and schools. Like their religious counterparts, educational institutions play an essential part in supporting and promoting individuals' wellbeing. At the same time, education and worship are both "activities where people sit together in an enclosed space to share a communal

experience," exacerbating the risk of contracting the coronavirus. *Gish*, 2020 WL 1979970, at *6. And here, the Order imposes the same restrictions on schools as it does on churches, synagogues, mosques, and other places of worship.

What is more, the interior of Beloved Church (like many churches of its kind) resembles that of a small movie theater. And, like moviegoers, during a service, congregants generally focus on the pastor or another speaker, who is typically in the front of the room. *See* Cassell Decl. ¶ 15 (photos of church interior). But, here again, movie theaters and concert halls (unlike churches) are completely barred from hosting any gatherings. April 30 Order § 2, ¶ 3. This reinforces the conclusion that the Order is not meant to single out religious people or communities of faith for adverse treatment.

This is not the first time that a governor's stay-at-home order has been challenged by a religious group, and the majority of courts in those cases have determined that the orders reflect neutral, generally-applicable principles. *See, e.g.*, *Gish*, 2020 WL 1979970, at *5–6 ("Because the Orders treat in-person religious gatherings the same as they treat secular in-person communal activities, they are generally applicable."); *Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327 JB/SCY, 2020 WL 1905586, at *35 (D.N.M. Apr. 17, 2020) ("[The government] may distinguish between certain classes of activity, grouping religious gatherings in with a host of secular conduct, to achieve . . . a balance between maintaining community health needs and protecting public health.").

23

For their part, Plaintiffs make much of *First Baptist v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021 (D. Kan. Apr. 18, 2020). In *First Baptist*, the stay-at-home orders in question prohibited "mass gatherings" at a number of establishments, including auditoriums, theaters, and stadiums, as well as "churches and other religious facilities." *Id.* at *2. The orders also exempted places like airports, "retail establishments where large numbers of people are present but are generally not within arm's length of one another for more than 10 minutes," and food establishments provided that patrons practice social distancing. *Id.*

Even though the orders covered a wide array of secular places as well as religious places, the court determined that the orders amounted to "a wholesale prohibition against assembling for religious services anywhere in the state by more than ten congregants." *Id*. at *4. "[B]oth orders," the court emphasized, "expressly state" that "their prohibitions against mass gatherings apply to churches or other religious facilities." *Id*. at *7. For that reason, *First Baptist* held that "these executive orders expressly target religious gatherings on a broad scale and are, therefore, not facially neutral." *Id.*

The approach in *First Baptist* is difficult to square with *Lukumi*. Taken alone, the fact that a government restriction refers to religious activity (while at the same time listing others) cannot be sufficient to show that its "object or purpose" is to target religious practices for harsher treatment. *Lukumi*, 508 U.S. at 533; *see Maryville Baptist Church, Inc. et al. v. Andy Beshear*, No. 20-5427, slip. op. at 7 (6th Cir. May 2, 2020) (slip opinion) (mentioning religious gatherings "by name" does not

24

establish "that the Governor singled out faith groups").  Instead, *Lukumi* embraced a functional assessment of how the challenged law operates in practice.  In engaging in that analysis, courts must consider how a particular stay-at-home order treats secular and religious activities that are substantially comparable to one another.  *First Baptist* overlooked that step.[6]

Nor does *Maryville Baptist*, a recently released Sixth Circuit opinion, support Plaintiffs' position.  That case involved a pair of stay-at-home orders that proscribed both "drive-in and in-person worship services," while permitting their secular equivalents.  *Maryville Baptist*, slip. op. at 1.  Because Kentucky's governor "offered no good reason" to treat drive-in religious services and drive-in businesses differently, the court halted enforcement of the prohibition on drive-in services.  *Id.* at 10.  At the same time, because of gaps in the factual record, the Court of Appeals allowed the ban on in-person services to continue pending further proceedings in the district court.  *Id.*

Applied here, the Sixth Circuit's reasoning counsels in favor of upholding Governor Pritzker's Order.  Unlike in *Maryville Baptist*, the April 30 Order confirms that religious organizations in Illinois may hold drive-in services.  *See* Supp. Not. at 1–2, ECF No. 32.  To the extent that the Sixth Circuit expressed concerns about restrictions on in-person services, those doubts stemmed from the

---

[6]    *On Fire Christian Center, Inc. v. Fischer*, another district court case Plaintiffs cite, does not support their position either.  No. 3:20-CV-264-JRW, 2020 WL 1820249 (W.D. Ky. Apr. 11, 2020).  In *Fischer*, the City of Louisville proscribed "drive-in church services, while not prohibiting a multitude of other non-religious drive-ins and drive-throughs."  *Id.* at *6. That is not the case here.

fact that the Kentucky Governor's orders prohibit in-person religious gatherings, regardless of how many worshippers attend. *Maryville Baptist*, slip. op. at 9. "[I]f the problem is numbers, and risks that grow with greater numbers," the court reasoned, "there is a straightforward remedy: limit the number of people who can attend a service at one time." *Id*. That is exactly what Governor Pritzker's latest order does.

Ultimately, then, the Court concludes that the April Order qualifies as a neutral, generally applicable law. It therefore withstands First Amendment scrutiny so long as "it is supported by a rational basis." *Anderson*, 870 F.3d at 639. Given the importance of slowing the spread of COVID-19 in Illinois, the Order satisfies that level of scrutiny, and Plaintiffs do not seriously argue otherwise. As a result, the Court finds that Plaintiffs' Free Exercise claim is unlikely to succeed on the merits.

**B.      State Law Claims**

**1.      Sovereign Immunity**

The Eleventh Amendment protects Defendants from Plaintiffs' RIFRA, EMAA, and DHA claims. That provision dictates that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although not explicit in the text, the Eleventh Amendment also "guarantees that an unconsenting State is immune from suits brought in federal courts by her own

citizens." *Council 31 of Am. Fed'n of State, Cty. & Mun. Employees, AFL-CIO v. Quinn*, 680 F.3d 875, 881–82 (7th Cir. 2012) (citations and quotation marks omitted). "[I]f properly raised, the amendment bars actions in federal court against . . . state officials acting in their official capacities." *Id.* (citation omitted).

Because Defendants are state officials, who have been sued in their official capacities and have raised sovereign immunity, the Eleventh Amendment shields them from Plaintiffs' state law claims. To be sure, "individual state officials may be sued personally" for federal constitutional violations committed "in their official capacities." *Goodman v. Carter*, No. 2000 C 948, 2001 WL 755137, at *9 (N.D. Ill. July, 2, 2001) (citing *Ex Parte Young*, 209 U.S. 12, 160 (1908)). But that principle does not extend to "claim[s] that officials violated state law in carrying out their official responsibilities." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984).

For example, in *Carter*, a court in this circuit considered a suit that raised claims under the First Amendment's Free Exercise Clause, as well as Illinois's RFRA statute. 2001 WL 755137, at *1. "[Plaintiff]'s ILRFRA claim," the *Carter* court observed, "asks this court to instruct state officials on how to conform their conduct to state law." *Id.* at *10. Explaining that "such a state-law claim may not be entertained under this court's supplemental jurisdiction simply because a proper § 1983 claim is also presented," the court applied the doctrine of sovereign immunity and dismissed the RFRA claim. *Id.* (citing *Pennhurst*, 465 U.S. at 121).

27

For the same reason, the Eleventh Amendment almost certainly forecloses Plaintiffs' state law claims here.

### 2. Merits of the State Law Claims

Sovereign immunity aside, the Court finds that Plaintiffs' RFRA, EMAA, and PHDA claims are unlikely to succeed on the merits. The Court addresses each statutory claim in turn.

### a. RFRA

For starters, Plaintiffs maintain that the Order violates Illinois's RFRA statute. Under that statute, the "government may not substantially burden a person's exercise of religion . . . unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling government interest." 775 Ill. Comp. Stat 35/15.

At this stage, the Court assumes (without deciding) that the Order's prohibition on in-person religious gatherings of more than ten people qualifies as a "substantial burden" under the RFRA. *Id*. § 35/15. That means that Defendants must show that the ten-person limitation is the least restrictive way to promote a compelling interest.

Turning first to the government's interest in fighting COVID-19, Plaintiffs reiterate their claim that "the coronavirus epidemic 'curve' has been substantially 'flattened' statewide." Compl. ¶ 69. Because previous stay-at-home orders have partially succeeded in limiting the pathogen's spread, Plaintiffs posit that the

28

government no longer has a compelling interest in preventing large gatherings. Yet the virus continues to proliferate, Illinoisans continue to die, and restrictions remain vital to ensuring that hospitals are not overwhelmed. April 30 Order at 1–2. In these exceptional circumstances, controlling the spread of COVID-19 counts as a compelling interest. *See United States v. Salerno,* 481 U.S. 739, 755 (1987) (recognizing that the government's interest in "the safety . . . of [its] citizens" is "compelling").

The remaining question is whether the ten-person limit is the "least restrictive means" of pursuing that goal. 775 Ill. Comp. Stat 35/15. This element turns on "whether [the government] could have achieved, to the same degree, its compelling interest" without interfering with religious activity. *Affordable Recovery Hous. v. City. of Blue Island*, No. 12 C 4241, 2016 WL 5171765, at *8 (N.D. Ill. Sept. 21, 2016). But Plaintiffs have failed to spotlight, and the Court has not found, any less restrictive rules that would achieve the same result as the prohibition on large gatherings.

While permitting the Beloved Church to hold in-person services with its full congregation might be less disruptive, it would not advance the government's interest in curtailing COVID-19 "to the same degree" as the ten-person limit. *Id.* The Court recognizes that Cassell has promised to equip worshippers with masks, place hand sanitizer at entryways, and arrange seating so that families can remain six feet apart and follow the social distancing requirements set forth in the Order.

29

Cassell Decl. ¶¶ 7–11. But it is not entirely clear, given the seating configuration at Beloved Church, whether social distancing would be possible.

According to Cassell, ten to fifteen families attend a typical service, and many are "large families, some with up to 12 members."[7] *Id.* ¶ 12. Yet the photographs of the church's interior provided by Cassell depict a total of twenty rows, many with fewer than seven seats. *Id.* ¶ 15. To remain six feet apart, it appears that each family unit must sit at least one row apart from another. It is difficult to see how the church could accommodate ten to fifteen large families in this manner.[8] But, even assuming that it is possible, an eighty-person service poses a greater risk to public safety than a gathering of ten or fewer or a drive-in service.

Indeed, Defendants highlight the example of a church choir practice where the members actually used hand sanitizer and practiced social distancing. *See* Richard Read, "A choir decided to go ahead with rehearsal. Now dozens have COVID-19 and two are dead," *Los Angeles Times* (Mar. 29, 2020). Despite those efforts, forty-five choir members ended up contracting COVID-19 and two died. *Id.*

---

[7] In fact, as Plaintiffs put it, "[t]he Church has numerous families that have taken seriously the biblical admonition to 'be fruitful and multiply.'" Pl. Reply at 3.

[8] Cassell also states that "[i]t is not feasible to conduct drive-in services on The Beloved Church's property" because they "do not have a parking lot that can accommodate such services." *Id.* ¶ 5. But the church appears to have a large parking lot that can accommodate a number of cars to conduct such services. *See* https://www.google.com/maps/place/216+W+Mason+St,+Lena,+IL+61048/@42.3784957,-89.827654,3a,75y,99.24h,66.75t/data=!3m6!1e1!3m4!1s-EqLIBLYW6X0O96wk9B0nA!2e0!7i13312!8i6656!4m5!3m4!1s0x8808103eadade1e7:0x6807f35e1247a6cb!8m2!3d42.378454!4d-89.8273456; *see also Ke Chiang Dai v. Holder*, No. 10-4636-ag, 455 Fed. Appx. 25, 26 n.1 (2012) (taking judicial notice of Google Maps).

As that example illustrates, large gatherings magnify the risk of contagion even when participants practice preventative measures.

It is also important to recognize the religious exercises that the April 30 Order does allow. In addition to drive-in services and smaller worship services, the Order permits Cassell and other staff members to visit and minister to parishoners in their homes. It allows small group meetings, bible study meetings, and prayer gatherings at the church or in private homes, subject to the ten-person limit. It empowers Cassell and members of his congregation to celebrate communion in small groups. And it authorizes individual congregants to go to the church to obtain spiritual help and guidance from their pastor and/or other church staff members. *See* Compl. ¶ 33 (noting that "prayer and spiritual counseling visits and meetings are central functions of [Cassell's] leadership").

Considering the seriousness of the continuing COVID-19 pandemic, the threat of additional infections in the context of large gatherings, and the avenues for religious worship, prayer, celebration, and fellowship that the April 30 Order does allow, the Court finds that no equally effective but less restrictive alternatives are available under these circumstances, and Plaintiffs' RFRA claim is thus unlikely to succeed on the merits.

### b. Emergency Management Agency Act

Plaintiffs also contend that Governor Pritzker exceeded his authority under the EMAA. That Act equips the Governor with an array of emergency powers, including the authority "[t]o control . . . the movement of persons within the area,

31

and the occupancy of premises therein." 20 Ill. Comp. Stat. 3305/7(8). To make use of those powers, the Governor must first issue a proclamation "declar[ing] that a disaster exists." *Id*. § 3305/7. After that, he may invoke the Act's emergency powers "for a period not to exceed 30 days." *Id*.

The question here is whether the Act permits Governor Pritzker to declare more than one emergency related to the spread of COVID-19.[9] In Plaintiffs' view, the ongoing pandemic only justifies a single 30-day disaster proclamation. In response, Defendants maintain that, so long as the Governor makes new findings of fact to determine that a state of emergency still exists, the Act empowers him to declare successive disasters, even if they stem from the same underlying crisis.

Based on the text and structure of the Act, Defendants have the better argument. By its terms, the Act defines a disaster as "an occurrence or threat of widespread or severe damage, injury or loss of life . . . resulting from . . . [an] epidemic." 20 Ill. Comp. Stat. 3305/4. The data show that COVID-19 has infected more and more residents and continues to do so; therefore, a "threat of widespread or severe damage, injury or loss of life" continues to exist. *Id*.; *see* April 30 Order at 1–2 (discussing the continued threat imposed by Covid-19).

This statutory construction makes sense. Some types of disasters, such as a storm or earthquake, run their course in a few days or weeks. Other disasters may cause havoc for months or even years. For example, the Act designates "air

---

[9]     Plaintiffs also cast Governor Pritzker's previous orders as improper continuations of the initial emergency declaration. Given that the Governor has issued a new disaster declaration, that argument is moot.

contamination, blight, extended periods of inclement weather, [and] drought" as disasters. 20 Ill. Comp. Stat. 3305/4. Those events pose a threat that may persist for long periods of time and certainly beyond a single 30-day period. It is difficult to see why the legislature would recognize these long-running problems as disasters, yet divest the Governor of the tools he needs to address them.

This is not to say that the Governor's authority to exercise his emergency powers is without restraint. To support each successive emergency declaration, the Governor must identify an "occurrence or threat of widespread or severe damage, injury or loss of life." 20 Ill. Comp. Stat. 3305/4. Once an emergency has abated, the facts on the ground will no longer justify such findings, and the Governor's emergency powers will cease. And, should this or any future Governor abuse his or her authority by issuing emergency declarations after a disaster subsides, affected parties will be able to challenge the sufficiency of those declarations in court. But in this case, Plaintiffs do not question the Governor's factual findings, only his authority to issue successive emergency proclamations based on the same, ongoing disaster. For these reasons, the Court concludes that this claim lacks even a negligible chance of success.

### c. Department of Health Act

Lastly, Plaintiffs invoke Illinois's Department of Health Act, 20 Ill. Comp. Stat. 2305/2(a). Under that Act, the "State Department of Public Health . . . . has supreme authority in matters of quarantine and isolation." *Id*. § 2305/2(a). Before exercising its authority to "quarantine," "isolate," and make places "off limits the

33

public," however, the Department must comply with certain procedural requirements. *Id.* § 2305/2(c). As Plaintiffs see it, the Act vests the Department with the exclusive authority to quarantine and isolate Illinoisans, making Governor Pritzker's orders *ultra vires*.

The problem for Plaintiffs is that the challenged Order does not impose restrictions that fall within the meaning of the Act. By definition, a "quarantine" refers to "a state of enforced isolation." *Quarantine*, Merriam-Webster, https://www.merriam-webster.com/dictionary/quarantine; *see also, e.g.*, *In re Washington*, 735 N.W.2d 111, 121–22 (Wis. 2007) (explaining that to "quarantine" is "to isolate"); *Com. v. Rushing*, 99 A.3d 416, 423 (Pa. 2014) (indicating that to "place in quarantine" equates to requiring an individual to be "*set apart*" from other members of society (emphasis added)); *Ex Parte Culver*, 202 P. 661, 664 (Cal. 1921) ("'Quarantine' as a verb means to keep persons, when suspected of having contracted or been exposed to an [infectious] disease, out of a community, or to confine them to a given place therein, and *to prevent intercourse between them and the people generally of such community*.'" (emphasis added) (citation omitted)).

As discussed above, the Order empowers Cassell to, among other things, worship and pray with small groups of his parishioners, visit them in their homes (while observing social distancing), and lead drive-in sermons. *See Daniel v. Putnam Cty.*, 38 S.E. 980, 981 (Ga. 1901) (noting that even stringent means of preventing disease dissemination are not "quarantine" unless they preclude

34

engagement between the individual and members of their community). So, while the Order curtails the ability of individuals to gather in large groups, it falls far short of a "quarantine" as that term appears in the Act. The Court therefore concludes that this claim has almost no likelihood of success on the merits.

## V.     <u>Equitable Considerations</u>

The remaining factors confirm that Plaintiffs are not entitled to a preliminary injunction. Under the Seventh Circuit's "sliding scale approach," the less likely a claimant is to win, the more that the "balance of harms [must] weigh in his favor." *Valencia v. City of Springfield, Ill.*, 883 F.3d 859, 966 (7th Cir. 2018). Given that Plaintiffs' claims have little likelihood of prevailing on the merits, they cannot obtain a preliminary injunction without showing that the scales tip heavily in their direction.

But, if anything, the balance of hardships tilts markedly the other way. Preventing enforcement of the latest stay-at-home order would pose serious risks to public health. The record reflects that COVID-19 is a virulent and deadly disease that has killed thousands of Americans and may be poised to devastate the lives of thousands more. April 30 Order at 1–2. And again, the sad reality is that places where people congregate, like churches, often act as vectors for the disease. *See* Pritzker Resp. at 12–13 (collecting examples). Enjoining the Order would not only risk the lives of the Beloved Church's members, it also would increase the risk of infections among their families, friends, co-workers, neighbors, and surrounding communities.

35

While Plaintiffs' interest in holding large, communal in-person worship services is undoubtedly important, it does not outweigh the government's interest in protecting the residents of Illinois from a pandemic. Certainly, the restrictions imposed by the Order curtail the ability of the congregants of Beloved Church to worship in whatever way they would like. But this is not a case where the government has "ban[ned]" worshippers from practicing their religion altogether, as Plaintiffs insist. PI Mot. at 8, ECF No. 7. And again, the Order empowers Cassell and the other members of his church to worship, sing, break bread, and pray together in drive-in services, online meetings, and in-person in groups of ten or fewer. April 30 Order § 2, ¶ 5(f). Such allowances go a long way towards mitigating the harms Plaintiffs identify.

Taking into account COVID-19's virulence and lethality, together with the State's efforts to protect avenues for religious activity, the Court finds that equitable considerations, including the promotion of the public interest, weigh heavily against the entry of the temporary restraining order and preliminary injunction that Plaintiffs seek. Coupled with the relative weakness of Plaintiffs' legal arguments, this is fatal to their motion.

## VI.    Conclusion

These are unsettling times.  Illinois and the rest of world are engaged in a massive effort to stave off the COVID-19 pandemic and the human suffering and death that it brings.    At the same time, the stay-at-home orders issued by government officials as part of these efforts have resulted in their own form of loss and suffering—financial, emotional, psychological, and spiritual.    The broader societal and political debate about how to balance these interests is beyond the purview of this Court.  For present purposes, it suffices to state that Governor Pritzker's April 30 Order satisfies minimal constitutional requirements as they pertain to religious organizations, like the Beloved Church.  Accordingly, Plaintiffs' motion for a temporary restraining order and a preliminary injunction is denied.

**IT IS SO ORDERED.**                    **ENTERED   5/3/20**

_____

**John Z. Lee**
**United States District Judge**